[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**October 19, 2004**
**THOMAS  K. KAHN**
**CLERK**

No. 03-14825

Agency No. A77-002-369

ISMAIL ABDILAHI D-MUHUMED,

Petitioner-Appellant,

versus

U.S. ATTORNEY GENERAL,

Respondent-Appellee.

Petition for Review of an Order of the
Board of Immigration Appeals

**(October 19, 2004)**

Before TJOFLAT, DUBINA and PRYOR, Circuit Judges.

DUBINA, Circuit Judge:

Ismail Abdilahi D-Muhumed ("D-Muhumed"), a native and citizen of Somalia, petitions this court for review of the final order of removal of the Board of Immigration Appeals ("BIA"). The BIA's order affirmed the Immigration Judge's ("IJ") decision which denied withholding of removal under the Immigration and Nationality Act ("INA") and the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment of Punishment ("CAT"). For the reasons that follow, we deny the petition for review.

## I. BACKGROUND

In December 1998, D-Muhumed attempted to enter the United States with a fraudulent Ethiopian passport. The Immigration and Naturalization Service ("INS") issued D-Muhumed a Notice to Appear, charging him with removability under INA § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i), for being an alien who, by fraud or willfully misrepresenting a material fact, sought to procure a visa, other documentation, or admission into the United States; and under INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), for being an immigrant who, at the time of application for admission, did not possess a valid, unexpired entry document.

During his interview with an asylum officer, D-Muhumed stated that his brother had been killed by an artillery shell in 1990, after which his family fled Mogadishu to the town of Baydhabo, where they remained until 1994. He also told the asylum officer that his father, a member of the Midgan clan, was killed by a member of the Darod clan and that, after his father's death, the family returned to Mogadishu, where a neighbor protected them from the ruling Hawiye clan. He claimed that from 1996 to 1998, the family remained in hiding at the home of a friend who was Hawiye. After the family's return to Mogadishu, the Hawiye clan killed another brother. D-Muhumed stated that, in 1998, following an attack by the Hawiye clan, the people who were hiding D-Muhumed's family told the family to leave. At that time, D-Muhumed fled the country.

D-Muhumed filed an application for asylum and withholding of removal, alleging that both his father and a brother had been killed by rival clan members, and that he had been wounded in the shoulder during the attack on his father. D-Muhumed averred that after his father's murder, his family moved from place to place in Somalia, attempting unsuccessfully to escape the violence. Following the family's return to Mogadishu in 1996, the Hawiye clan attacked them and killed his brother. D-Muhumed stated that his family then went into hiding at a friend's Mogadishu house until 1998, when the Hawiye attacked the house, and his friend

3

told them to leave. In his application, D-Muhumed claimed that he was persecuted based on his membership in the Midgan clan and that, if he returned to Somalia, he would be killed by members of the major clans because the same thing had happened to other members of his family, and there was no peace in his country.

At his subsequent hearing before the IJ, D-Muhumed conceded removability and requested asylum and withholding of removal. D-Muhumed reiterated the concerns he enumerated in his asylum application and provided more details about his family's problems. Specifically, D-Muhumed testified that after the Darod clan killed his father, and his family returned to Mogadishu in 1996, people were always trying to attack his family. One night, a man knocked on their door, climbed over the wall of their house, and shot and killed one of his brothers while the rest of the family fled. Following that incident, his family fled to another neighborhood where a friend of his father's, who was Hawiye, agreed to let them stay at his house. D-Muhumed stated that the family stayed with this friend for two years, during which time he never left the house. He also testified that on every night of this two-year period, Hawiye clan members would come to the house and demand to see the Midgan who was staying there. D-Muhumed stated that beginning the second week that they were there, the Hawiye attacked the house every night for two years by firing bullets at the house. The man who

4

owned the house would return fire. Eventually, the Hawiye killed the man's son during one of the attacks. D-Muhumed stayed only one more month at the house.

On cross-examination, D-Muhumed claimed that the town of Baydhabo was controlled by the Darod clan at the time his family arrived there, but over the course of their stay, power changed hands several times between the Darod and Hawiye. The Hawiye were in power when the Darod clan killed his father. When the government pointed out that D-Muhumed's asylum application did not mention that the Hawiye had attacked the house where he was staying every night between 1996 and 1998, D-Muhumed asserted that this inconsistency was due to the language barrier. The IJ asked D-Muhumed's counsel, who had prepared the asylum application, if she believed that D-Muhumed understood all of the questions that she asked, and she responded affirmatively.[1]

---

[1] The IJ also considered the U.S. State Department's Somalia Country Report on Human Rights Practices for 1998 ("1998 Country Report") and the U.S. State Department's "Somalia: Profile of Asylum Claims and Country Conditions" for December 1996 ("1996 Profile"). The 1996 Profile described how the four dominant sub-clans were the Issak in the north, the Darod in the northeast along the Kenyan border, the Hawiye in the central region stretching from Mogadishu, and the Rahanweyn, which traditionally was less powerful. It stated that each of these clans was further divided into an intricate web of sub-clans and sub-sub-clans, which feuded and formed alliances in a constantly shifting pattern, and there was a fluctuation of power between traditional clan leaders and clan-based militias and factions. The 1996 Profile did not specifically mention the Midgan clan. Notably, it stated that there was no automatic correlation between clan affiliation and danger of persecution, and whether a fear based on clan membership was well-founded depended on the nature and durability of the alleged threat and the alien's physical location within the country. The 1998 Country Report stated that Somalia had been without a central government since the dictator Mohamed Siad Barre fled the country in 1991. The 1998 Country Report stated that, after the withdrawal of United Nations peacekeepers in 1995, clan and factional militias continued to rule

The IJ found significant discrepancies between D-Muhumed's asylum application and his testimony, particularly with respect to the events that occurred after mid-1996. The IJ found that, in his application, D-Muhumed stated that the Hawiye attacked the Mogadishan house where he was staying only once in 1998, but he testified at the hearing that the Hawiye attacked the house more than 1,000 times between mid-1996 and the end of 1998. The IJ found incredible D-Muhumed's claims that the Hawiye attacked the house so many times and that he never left the house for more than two years. The IJ also determined that it was incredible that the Hawiye clan members never succeeded in harming D-Muhumed or any of his family members in so many attempts, and that D-Muhumed's story did not seem believable because nothing happened to him when he finally left the house to secure his departure from Somalia in 1998.

The IJ concluded that the general turmoil in Somalia during the relevant period when D-Muhumed's story took place did not, by itself, give rise to a valid asylum claim, and that most of the tribal conflict amounted to no more than discrimination. The IJ found that, because D-Muhumed could not meet his burden to show eligibility for asylum, he could not meet the higher burdens required to

---

various regions of the country with varying degrees of effectiveness. However, it stated that serious interclan fighting occurred only in the central Somali regions of Bay and Bakool, the southern regions of Gedo and Lower Juba, and around Kismayo, but not in Mogadishu.

6

obtain withholding of removal or relief under the CAT.  The IJ ordered D-Muhumed removed to Somalia.

D-Muhumed appealed the IJ's decision to the BIA.  The BIA agreed with the IJ's observations regarding the discrepancies in D-Muhumed's description of his experiences in Somalia between 1996 and 1998.  Hence, the BIA agreed with the IJ's adverse credibility finding and found that D-Muhumed was ineligible for the relief he sought.  D-Muhumed then filed this petition for review.

## II.  ISSUE

Whether there is substantial evidence in the record to support the IJ's finding that D-Muhumed failed to present credible evidence in support of his asylum application.

## III.  STANDARD OF REVIEW

To the extent that the BIA's decision was based on a legal determination, this court's review is *de novo.  Mohammed v. Ashcroft*, 261 F.3d 1244, 1247 (11th Cir. 2001).  The BIA's factual determinations are reviewed under the substantial evidence test, and this court "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a

whole." *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (internal quotations and citation omitted). When the BIA does not render its own opinion but rather adopts the IJ's opinion, then this court, in essence, reviews the IJ's decision. *Gao v. Ashcroft*, 299 F.3d 266, 271 (3d Cir. 2002) (citation omitted). Credibility determinations likewise are reviewed under the substantial evidence test. *See id.* at 272. The trier of fact must determine credibility, and this court may not substitute its judgment for that of the BIA with respect to credibility findings. *Vasquez-Mondragon v. INS*, 560 F.2d 1225, 1226 (5th Cir. 1977)[2] (citations omitted).

## IV. DISCUSSION

D-Muhumed argues that the IJ erred by finding that he was not eligible for asylum based on a well-founded fear of persecution. D-Muhumed contends that he established a well-founded fear of future prosecution based upon widespread persecution of his clan in Somalia and the past persecution of members of his family. The government responds that the IJ did not err in its credibility

---

[2]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

determination because a reasonable adjudicator would not be compelled to conclude that D-Muhumed presented a credible asylum claim. We agree.

An alien who arrives in or is present in the United States may apply for asylum. *See* 8 U.S.C. § 1158(a)(1). The Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." 8 U.S.C. § 1158(b)(1). A "refugee" is

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the burden of proving statutory "refugee" status. *See Al Najjar*, 257 F.3d at 1284.

To establish asylum eligibility, "the alien must establish a 'well-founded fear' that his or her political opinion (or other statutorily listed factor) will cause harm or suffering that rises to the level of 'persecution.'" *Id.* at 1287 (citing 8 U.S.C. § 1101(a)(42)(A)). "Demonstrating such a connection requires the alien to present specific, detailed facts showing a good reason to fear that he or she will be *singled out* for persecution on account of such an opinion." *Id.* (internal

9

quotations and citation omitted) (emphasis in original). If the alien establishes past persecution, the burden shifts to the government to prove by a preponderance of the evidence that (1) "[t]here has been a fundamental change in circumstances such that the [alien] no longer has a well-founded fear of persecution [or (2) the alien] could avoid future persecution by relocating to another part of the [alien's] country. . . ." 8 C.F.R. § 208.13(b)(1)(i), (ii). Uncorroborated but credible testimony from the applicant may be sufficient alone to sustain the burden of proof for asylum or withholding of removal. 8 C.F.R. § § 208.13(a), 208.16(b).

Although an applicant's uncorroborated but credible testimony may be sufficient alone to sustain the burden of proof for asylum, *see id.*, in this case, the IJ noted numerous inconsistencies between D-Muhumed's asylum application, his testimony at the hearing, and the documentary evidence. The IJ provided "cogent reasons for his credibility determination" and those reasons are "supported by substantial evidence in the record much like any factual determination." *Beganovic v. Ashcroft*, No. 03-60185, 2004 WL 1759252, at *4 (5th Cir. Aug. 5, 2004) (citations omitted); *see also Lopez De Jesus v. INS*, 312 F.3d 155, 161 (5th Cir. 2002) (stating that "a credibility determination may not be overturned unless the record compels it"). Specifically, the IJ did not believe that D-Muhumed could have lived, for over two years, in a house that the Hawiye clan attacked daily

10

without suffering any harm. The IJ also found that, if the situation was as D-Muhumed claimed, it was not plausible that D-Muhumed could have safely left the house without incident when he finally arranged to leave the country. Furthermore, the IJ reasoned that, if the Hawiye clan did attack the house daily for over two years, D-Muhumed would have included that fact in his asylum application because it was a significant part of his claim.

Given the IJ's enumeration of these inconsistencies, which are supported by the record, we will not substitute our judgment for that of the IJ with respect to its credibility findings. *See Vasquez-Mondragon*, 560 F.2d at 1226. Additionally, although the IJ's extremely detailed adverse credibility determination alone may be sufficient to support the IJ's denial of D-Muhumed's petition, *see Singh-Kaur v. INS*, 183 F.3d 1147, 1149-53 (9th Cir. 1999) (affirming BIA's denial of asylum application based on the IJ's adverse credibility determination alone), our review of the record reveals substantial evidence supporting the IJ's finding that D-Muhumed failed to establish a well-founded fear of persecution.

As for D-Muhumed's claim of withholding of removal, we find that he cannot show that his life or freedom would "more likely than not" be threatened or persecuted upon return to his country because of his membership in the Midgan clan. *See Mendoza v. United States Attorney Gen.*, 327 F.3d 1283, 1287 (11th Cir.

2003); 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16(b).  This standard is more stringent than the "well-founded fear" standard for asylum.  *See Al Najjar*, 257 F.3d at 1293.  Accordingly, because D-Muhumed cannot meet the "well-founded fear" standard for asylum, it is *a fortiori* that he cannot meet the withholding of removal standard.  *See id*. at 1292-93.

Lastly, D-Muhumed cannot prevail on his claim for CAT relief because he cannot show that he "more likely than not" will be tortured upon his return to Somalia.  8 C.F.R. § 208.16(c)(2).

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).  D-Muhumed fails to demonstrate that the harm he suffered was inflicted at the instigation of, or with the consent or acquiescence of, a public official.  The objective evidence indicates that Somalia currently has no central government, and the clans who control various sections of the country do

so through continued warfare and not through official power.  Hence, D-Muhumed's claim for CAT relief fails.

For the foregoing reasons, we deny D-Muhumed's petition for review.

**PETITION DENIED**.